# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**JENNY I. GARCIA,**                    Case No. 1:19 CV 897

  Plaintiff,                    Judge James Gwin

  v.                    Magistrate Judge James R. Knepp II

**COMMISSIONER OF SOCIAL SECURITY,**

  Defendant.                    **REPORT AND RECOMMENDATION**

## INTRODUCTION

Plaintiff Jenny I. Garcia ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB") and supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter has been referred to the undersigned for preparation of a report and recommendation pursuant to Local Rule 72.2. (Non-document entry dated April 22, 2019). Following review, and for the reasons stated below, the undersigned recommends the decision of the Commissioner be affirmed in part and reversed in part.

## PROCEDURAL BACKGROUND

Plaintiff filed for DIB and SSI in January 2016, alleging a disability onset date of March 16, 2015. (Tr. 178-87). Her claims were denied initially and upon reconsideration. (Tr. 101-07, 109-13). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before an Administrative Law Judge ("ALJ") on December 22, 2017. (Tr. 33-50). On June 6, 2018, the ALJ found Plaintiff not disabled in a written decision. (Tr. 9-18). The Appeals Council denied

Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-6); *see* 20 C.F.R. §§ 404.955, 404.981, 416.1455, 416.1481. Plaintiff timely filed the instant action on April 22, 2019. (Doc. 1).

**FACTUAL BACKGROUND**

Personal Background and Testimony

At the time of the December 2017 hearing, Plaintiff was 48 years old and lived alone. (Tr. 36). She last worked March 16, 2015 as a manager at a gas station. (Tr. 37). She stopped working when her "whole right side went completely dead, and [she] ended up in the hospital." (Tr. 38); *see also* Tr. 43. The numbness continued on her right side. (Tr. 39); (Tr. 43) ("My right foot won't work. Sometimes it works, and sometimes it doesn't."); (Tr. 44) ("[M]y arm sometimes doesn't work correctly, and I can't lift it up all the way.").

Plaintiff reported it was hard to do dishes and clean because her "hand doesn't work all the time". (Tr. 46). She also had difficultly cooking because standing too long caused her right side to hurt. *Id.* She could not do laundry because she could not walk upstairs. *Id.* The weather, particularly rain and cold, aggravated her symptoms. *Id.* Plaintiff tried various medications and therapies, including water therapy, but nothing worked. (Tr. 40). Her medications caused drowsiness, dizziness, and weight gain. (Tr. 43-44). Plaintiff's condition had worsened over time. (Tr. 47).

Plaintiff also received mental health treatment for depression and anxiety, which she attributed at least in part to her physical pain. (Tr. 41). Plaintiff also reported memory problems. (Tr. 47) ("I forget stuff and when I'm talking, sometimes I forget where I'm going. . . . I don't remember stuff.").

Plaintiff dropped things and tripped due to carpal tunnel syndrome and fibromyalgia. (Tr. 44-45). She had fallen more than three times in the prior two years. (Tr. 45). Plaintiff also

2

experienced migraines about once every other month, but had medication that stopped them. (Tr. 46).

Relevant Medical Evidence

*Mental Health*

Plaintiff began treating with primary care physician Erica Roesch, M.D., in April 2015. *See* Tr. 1323. That month, Dr. Roesch observed Plaintiff had "mildly low mood" and a flat affect, but good eye-contact, good insight, intact judgment, and logical thoughts. (Tr. 434).

In August 2015, a neurological evaluation revealed Plaintiff was alert and oriented, with intact recent and remote memory ("[i]mmediate memory intact by 3 item recall and 7 digit recall"). (Tr. 404, 603). Plaintiff denied depression or anxiety, and the neurologist noted a normal affect and cooperative behavior. (Tr. 404).

Dr. Roesch made similar-to-previous psychological examination findings in October 2015 ("mildly low" mood, "good" or "mildly flat" affect, "decent" or "good" insight, good eye contact, logical thought, judgment intact) (Tr. 617, 628), and March 2016 ("good" mood, "mildly flat" affect, good insight, good eye contact, logical thought, intact judgment) (Tr. 829).

In March 2016, Plaintiff underwent a consultative psychological examination with Ronald Smith, Ph.D. (Tr. 694-700). Plaintiff reported applying for disability because it was "hard for her to do anything", "[h]er legs go out", and "she's in pain all the time." (Tr. 694). Plaintiff reported working at gas stations for the prior 19 years (ending March 16, 2015). (Tr. 695). Plaintiff began taking Cymbalta (prescribed by her family physician) the prior year, but "she thought it was really for pain." (Tr. 697). Dr. Smith observed Plaintiff was cooperative, related well, and had well-organized thoughts. *Id.* She described an "up and down" mood, worse when her pain is bad. *Id.* Plaintiff reported crying "every few days". *Id.* Plaintiff reported memory difficulties she attributed

3

to gabapentin and Topamax. (Tr. 698). Plaintiff colored and read at home; she could dust, make her own meals, wash dishes, grocery shop, and eat out in restaurants; but her daughters did heavier cleaning like vacuuming and laundry. (Tr. 698-99). Dr. Smith diagnosed adjustment disorder with depressed mood and alcohol use disorder (mild, in one-year remission). (Tr. 699).

In May 2016, Dr. Roesch diagnosed Plaintiff with a depressed mood (Tr. 903) after observing a depressed mood and flat affect, but good insight, good eye contact, logical thought, and intact judgment (Tr. 284). She noted Plaintiff took Cymbalta for fibromyalgia pain, and referred her to psychology. (Tr. 903).

Plaintiff began seeing therapist Kimberley Hardy, LPCC-S., in May 2016. (Tr. 1315). Plaintiff reported depression related to her physical condition, and depression in the past based on the loss of a child. *Id.* She was sad most of the day every day, took less pleasure in activities, and had difficulty focusing. *Id.* On mental status evaluation, Ms. Hardy observed Plaintiff made appropriate eye contact, and her attitude and behavior were "[c]ooperative, [e]nraged, [and] [t]earful". (Tr. 1319). Plaintiff's speech was coherent and pressured, her mood depressed, and her affect exaggerated. *Id.* She had fair past and remote memory, and fair retention, but impaired recent memory. *Id.* Her insight and judgment were fair/poor. *Id.*

In June 2016, Ms. Hardy noted Plaintiff attributed sleepiness to a recent increase in her gabapentin dosage. (Tr. 1306). She observed Plaintiff had a depressed and anxious mood, labile affect, and pressured speech. *Id.* Ms. Hardy diagnosed major depressive disorder (recurrent, moderate). *Id.* Ms. Hardy continued this diagnosis two weeks later, and added an additional diagnosis of borderline personality disorder. (Tr. 1302). She noted this was due to Plaintiff's symptoms of marked diminished self-image, impulsivity with suicidal thoughts, chronic feelings of emptiness, severe paranoid ideation, and dissociative symptoms. (Tr. 1300).

4

Plaintiff continued to see Ms. Hardy through August 2017. *See* Tr. 1196-1319. At these appointments, Plaintiff reported financial stressors, physical health stressors and symptoms of depression. *See id.* On mental status examinations, Ms. Hardy noted Plaintiff was cooperative, calm, and friendly at times, and irritable, tearful, and with difficulty focusing at others. *See id.* Her affect was frustrated, anxious, blunted, neutral, intense, off-task, or concerned, and her mood was congruent with her affect. *See id.* Her speech was often pressured, and her thought processes ranged from normal to circumstantial, hopeless, or containing depressive thoughts. *Id.* Her memory was fair throughout, and her insight and judgment ranged from poor to fair/poor to fair/good. *Id.*

### *Mental Health Opinion Evidence*

After the March 2016 consultative examination, Dr. Smith offered a mental functional assessment. (Tr. 699-700). Therein, he opined Plaintiff was capable of: understanding, remembering, and carrying out job instructions; maintaining adequate attention and concentration and maintaining persistence and pace to perform simple multi-step tasks; responding appropriately to supervision and coworkers in a job setting; and dealing appropriately with work pressures. *Id.*

In April 2016, State agency reviewing psychologist Katherine Fernandez opined that Plaintiff had mild restrictions in activities of daily living, social functioning, and maintaining concentration, persistence, or pace. (Tr. 78). She reviewed Dr. Smith's opinion, and opined that Plaintiff had non-severe mental disorders. (Tr. 77).

In July 2016, State agency reviewing psychologist Robyn Murry-Hoffman, Ph.D., offered the same opinion, also noting Plaintiff's mental disorders were non-severe. (Tr. 55-56). She noted Plaintiff's psychological evaluation "showed at most mild limitations" and although Plaintiff was "in counseling . . . for coping", her provider "did not want to send records." (Tr. 56).

5

*Physical Health*

In March 2015, Plaintiff went to the emergency room after a gradual onset of pain in the right side of her neck and a heavy feeling in her right arm and leg. (Tr. 518). An x-ray of her cervical spine showed mild straightening of the cervical lordosis and no acute fractures. (Tr. 535). Plaintiff's discharge diagnosis was cervical radiculopathy. (Tr. 527). A lumbar spine x-ray taken later that month showed mild facet arthrosis and disc space narrowing at L5-S1, and possible right L5 spondylolysis. (Tr. 492).

Plaintiff saw Domingo Ramos, M.D., later that month reporting worsening neck pain, asthma, chest pain, and lower back pain. (Tr. 487-88). On examination, Plaintiff had tenderness and "moderate" pain with motion in her cervical spine, lumbar spine, and shoulder. (Tr. 490). Dr. Ramos prescribed Voltaren topical gel, gabapentin, and Robaxin. *Id.* Plaintiff returned in early April reporting improving intermittent neck pain. (Tr. 481-82). On examination, she had tenderness in her cervical and lumbar spine, and "mild" pain with motion. (Tr. 484). Dr. Ramos added Cymbalta and simvastatin to Plaintiff's medications. (Tr. 485).

A few days later, Plaintiff saw nurse practitioner Michelle L. Veneman, CNP, in the office of Dr. Roesch, complaining of right-sided back pain. (Tr. 434-36). She described intermittent pain in her right leg, some numbness/tingling/weakness, and trouble walking. (Tr. 435). Ms. Veneman assessed right low back pain and right leg pain, as well as right cervical radiculopathy. (Tr. 436). She ordered lab work and referred Plaintiff for osteopathic manipulative therapy with Dr. Borland. *Id.*

Plaintiff saw Dr. Roesch a few weeks later. (Tr. 555-63). Dr. Roesch observed Plaintiff had a limited range of motion in her back, mild paraspinous muscle tenderness, right sacroiliac joint tenderness, positive facet loading (right greater than left), and positive sacral rotation. (Tr. 558).

6

She diagnosed fibromyalgia, for which she increased Plaintiff's Cymbalta dosage. (Tr. 555). She also diagnosed cervical radiculopathy (noting that Plaintiff was doing physical therapy and improving with her home exercise program), and sacroiliac joint dysfunction (noting Plaintiff had an upcoming appointment with Dr. Borland for osteopathic treatment). (Tr. 555).

Plaintiff saw Cary Borland, D.O., in early May 2015. (Tr. 564-65). On examination, Dr. Borland observed pain to palpation in the right sacroiliac joint, pain with spinal flexion, and bilateral hip restriction. (Tr. 565). Later that month, Plaintiff told Ms. Veneman that Dr. Borland helped her back pain and right posterior thigh/buttock pain; however, she sometimes lost her balance or her right foot went numb. (Tr. 571). She reported walking much better without pain, and some improvement to her neck pain after physical therapy and her home exercise program. *Id.* On examination, Plaintiff had a normal gait and normal sensation. (Tr. 574). Ms. Veneman diagnosed low back pain, sacroiliac joint dysfunction, and fibromyalgia; she increased a Neurontin prescription and instructed Plaintiff to follow up with osteopathic manipulative therapy as needed, as well as attend aquatic therapy. *Id.*

In June, a physical therapist noted Plaintiff presented with right lower extremity subjective instability and paresthesia in the right lower extremity "that is not reproduced with testing today". (Tr. 426). June knee x-rays were unremarkable. (Tr. 455).

In July, Plaintiff reported still feeling weakness on her right side, but no significant pain. (Tr. 591). She did not feel the need to return to Dr. Borland at that time, and was doing a home exercise physical therapy program. *Id.* Ms. Veneman noted Plaintiff indicated she was feeling well. *Id.* On examination, Ms. Veneman noted Plaintiff's gait was normal. (Tr. 593). She continued fibromyalgia and sacroiliac joint dysfunction diagnoses and noted Plaintiff should continue her

home exercise program and contact the office if she wanted to see Dr. Borland again. (Tr. 593-94).

Plaintiff underwent a neurology consultation in August 2015 with Dina Boutros, M.D. (Tr. 401-05). She had normal motor tone and strength, normal reflexes, normal sensation, and a stable gait. (Tr. 404-05).

In October, Plaintiff returned to Dr. Roesch reporting, *inter alia*, headaches, leg pain, and fatigue. (Tr. 615). She noted her leg pain had improved overall, but returned intermittently; she also described fatigue and pain with standing for lengthy periods. *Id.*

A thoracic spine x-ray in April 2016 showed early mild degenerative changes. (Tr. 324-35); *see also* Tr. 286 (describing x-ray as showing "mild arthritic changes").

In May 2016, Plaintiff saw Dr. Roesch. (Tr. 283-84). She reported falling after her right leg gave out on her. (Tr. 283). Dr. Roesch ordered x-rays of Plaintiff's right ankle and lumbar spine. *Id.* These revealed no acute findings. *See* Tr. 282.

In July 2016, Plaintiff reported aches and pains, flaring up with different activities. (Tr. 934). She described going to her daughter's house and sitting outside, and feeling "very tired" when she left. *Id.* She also reported the increase in her gabapentin dosage had helped with her leg pain. *Id.* She continued to have migraine headaches. *Id.*

Plaintiff returned to Dr. Roesch in November 2016. (Tr. 989). Plaintiff reported fatigue and daily pain, as well as difficulty sleeping. (Tr. 990). She could not stand for lengthy periods due to pain in her back; however, she also reported being able to walk more easily. *Id.* On examination, Dr. Roesch observed Plaintiff had full range of motion in her back, but also paraspinous muscle tenderness, bilateral sacroiliac joint tenderness, and pain with facet loading and sacral rotation.

(Tr. 991). She continued to assess fibromyalgia, and noted she was trying to get Plaintiff in to a fibromyalgia clinic. (Tr. 989).

In January 2017, Dr. Roesch increased Plaintiff's Cymbalta dosage to treat her fibromyalgia. (Tr. 1002). Plaintiff continued to report intermittent pain; she also reported hand swelling and lumps on her forearms. (Tr. 1003). The following month, Plaintiff reported the increased Cymbalta dosage helped her mood and her pain, but her fibromyalgia was still flaring at times. (Tr. 1013-14). On examination, Plaintiff had tenderness in her shoulders, chest wall, quadriceps, biceps, triceps, and calf muscles. (Tr. 1016). Her gait was slow and antalgic, and she had mild pain with internal rotation in her right hip. *Id.*

In April 2017, Dr. Roesch continued to diagnose fibromyalgia "in current flare" and right arm weakness/numbness. (Tr. 1037). She questioned whether Plaintiff might have complex regional pain syndrome or a conversion disorder/somatic pain. *Id.*

In August 2017, Plaintiff underwent a functional capacity evaluation with physical therapist Pat Carey. (Tr. 1190-94). On examination, Mr. Carey observed Plaintiff had full strength in her upper and lower extremities. (Tr. 1191). Her trunk and cervical flexion, extension, rotation, and side bend were within functional limits. *Id.* Plaintiff's actual sit time was 65 minutes; actual stand time was fifteen minutes, and actual walk time was four minutes. (Tr. 1193). He also tested Plaintiff's abilities to lift, grip, and pinch. (Tr. 1192). Mr. Carey opined Plaintiff demonstrated consistency of effort and that her scores indicated the test results were a valid representation of Plaintiff's functional capacity. (Tr. 1194). He also noted that Plaintiff scored high on pain questionnaires "indicating a significant trend toward symptom disability behavior." *Id.*

In September 2017, Plaintiff told Dr. Roesch that her fatigue was worse on painful days and that she had two non-functional days the prior week. (Tr. 1325). Plaintiff reported a

fibromyalgia pain flare and that she had fallen since her last appointment. (Tr. 1326). She was not sleeping well, and used a heated blanket to help with pain. *Id.* On examination, Plaintiff had a slow gait, and mildly tender quadriceps, calf, and deltoid muscles; she also had tender points on her upper back. (Tr. 1328). Dr. Roesch instructed Plaintiff to continue her fibromyalgia medications and to reschedule a cancelled pain management appointment. (Tr. 1325).

At her counseling appointments with Ms. Hardy, Plaintiff consistently reported physical pain. *See* 1202, 1209, 1224, 1236, 1239, 1254, 1260, 1297, 1305, 1313. Ms. Hardy frequently described Plaintiff's walk as "rigid". (Tr. 1209, 1212, 1224, 1239, 1257, 1260, 1266, 1297). Other times, she noted normal gait (Tr. 1227, 1230, 1233). In February 2017, Ms. Hardy noted Plaintiff was limping on her way in, and "grimacing during the session." (Tr. 1228).

### Physical Health Opinion Evidence

In February 2016, State agency physician Lynne Torello, M.D., reviewed Plaintiff's records and offered an opinion regarding her physical functional abilities. (Tr. 79-81). She opined Plaintiff could occasionally lift 50 pounds, and frequently lift 25; Plaintiff could stand or walk, or sit, for about six hours each in an eight-hour workday. (Tr. 80). She opined Plaintiff had an unlimited ability to climb ramps or stairs, and balance, but could only occasionally climb ladders, ropes, or scaffolds, and frequently stoop, kneel, crouch, and crawl. *Id.*

In June 2016, State agency physician Elizabeth Das, M.D., reviewed Plaintiff's records and offered an opinion similar to that of Dr. Torello. (Tr. 58-59). Dr. Das's opinion differed only in that she opined Plaintiff could only frequently climb ramps or stairs or balance, occasionally climb ladders, ropes, or scaffolds, and had no kneeling limitations. (Tr. 59).

After his August 2017 functional capacity examination, Mr. Carey opined Plaintiff could stand for two hours per day, fifteen minutes at a time. (Tr. 1193). Mr. Carey opined Plaintiff could

10

sit for four hours per day, one hour at a time. *Id.* He opined Plaintiff could occasionally lift and carry 20-25 pounds, and frequently lift and carry ten to twelve *Id.* Mr. Carey opined Plaintiff had the ability to work part-time. (Tr. 1194). Dr. Roesch also signed this opinion. *See id.*

In September 2017, Dr. Roesch completed a physical impairment questionnaire. (Tr. 1321-22). She listed a diagnosis of fibromyalgia and noted Plaintiff's prognosis was "stable". (Tr. 1321). She described Plaintiff's symptoms as pain in her upper and lower extremities and weakness; she indicated Plaintiff's symptoms were severe enough to interfere with attention and concentration "often". (Tr. 1321). Dr. Roesch left blank questions regarding Plaintiff's specific functional blank, but wrote what appears to say: "please see attached evaluation". *Id.* Dr. Roesch also checked a box indicating Plaintiff was not capable of working an eight-hour day five days per week on a sustained basis. (Tr. 1322). She further indicated in an onset date questionnaire that her opinion regarding Plaintiff's limitations dated back to at least April 2015. (Tr. 1323).

The record also contains four letters stating Plaintiff is unable to work. *See* Tr. 705 (May 2015 letter from Ms. Veneman stating Plaintiff was "currently unable to work"); Tr. 704 (July 2015 letter from Ms. Veneman stating Plaintiff was "currently unable to work"); Tr. 703 (April 2016 letter from nurse practitioner Virginia Brugger stating Plaintiff was "currently unable to maintain gainful employment at this time due to her multiple chronic conditions."); Tr. 799 (March 2017 medical excuse note from Dr. Roesch stating that "due to her medical conditions", Plaintiff was "unable to sit or stand, lift, push, pull or walk for 8 hour periods of time").

VE Testimony

A VE appeared and testified at the hearing before the ALJ. (Tr. 48-49). The ALJ asked the VE to consider a hypothetical individual with Plaintiff's age, education, work experience, and residual functional capacity ("RFC") as ultimately determined by the ALJ. *See id.* The VE

responded that such an individual could perform Plaintiff's past work a cashier and assistant manager. (Tr. 49).

ALJ Decision

In his June 6, 2018 written decision, the ALJ found Plaintiff met the insured status requirements for DIB through December 31, 2019 and had not engaged in substantial gainful activity since her alleged onset date of March 16, 2015. (Tr. 11). He found Plaintiff had severe impairments of fibromyalgia, cervical radiculopathy, degenerative disc disease of the back, chronic migraines, leukocytosis, and arthralgia (Tr. 12), but that none of these impairments – singly or in combination – met or medically equaled the severity of a listed impairment (Tr. 13). The ALJ concluded Plaintiff had the residual functional capacity to "perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except [she] can occasionally climb ladders, ropes or scaffolds and can frequently stoop, kneel, crouch and crawl." (Tr. 14). The ALJ determined, based on this RFC, that Plaintiff could perform her past relevant work as an assistant manager and cashier. (Tr. 17). Therefore the ALJ found Plaintiff not disabled. *Id.*

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*,

474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) & 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine if a claimant is disabled:

1.   Was claimant engaged in a substantial gainful activity?

2.   Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.   Does the severe impairment meet one of the listed impairments?

4.   What is claimant's residual functional capacity and can claimant perform past relevant work?

5.   Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age,

13

education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

### DISCUSSION

Plaintiff raises two objections to the ALJ's decision – one directed at the consideration of her mental impairments, and one directed at the consideration of her physical impairments. As to her mental impairments, Plaintiff contends the ALJ erred by: (1) failing to find them severe at Step Two; and (2) failing to consider the combined effect of her mental and physical (and severe and non-severe) impairments in later steps. As to her physical impairments, Plaintiff contends the ALJ failed to recognize or evaluate Mr. Carey's functional capacity evaluation, which was co-signed by Dr. Roesch. For the reasons discussed below, the undersigned recommends the Court affirm the ALJ's decision as to Plaintiff's mental impairments, but reverse and remand for consideration of the functional capacity evaluation.

Consideration of Plaintiff's Mental Impairments

Plaintiff contends the ALJ erred in not finding her mental impairments severe at Step Two of his analysis, and then failing to consider them in combination with those physical impairments he found severe at later steps of his analysis. She specifically argues that her mental health issues were directly related to her physical health issues. For the reasons discussed below, the undersigned finds no error.

At Step Two, an ALJ must determine a claimant's "severe" impairments. A severe impairment is one which significantly limits an individual's ability to perform basic work activities. 20 C.F.R. § 404.1520(c), 416.920(c). An impairment is only considered non-severe if it

is a "slight abnormality that minimally affects work ability regardless of age, education, and experience." *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988).

The Sixth Circuit has held that where the ALJ finds the presence of a severe impairment at Step Two and proceeds through the remaining steps of the analysis, the alleged failure to identify as severe some other impairment constitutes harmless error so long as the ALJ considered the entire medical record in rendering his decision. *See Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987); *Kirkland v. Comm'r of Soc. Sec.*, 528 F. App'x 425, 427 (6th Cir. 2013) ("[S]o long as the ALJ considers all the individual's impairments, the failure to find additional severe impairments . . . does not constitute reversible error[.]"); *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008) (holding that as long as ALJ considers all impairments, failure to deem a single impairment non-severe is "legally irrelevant").

Given this, the undersigned turns first to the second question: Even assuming the ALJ did err in finding Plaintiff's mental impairments non-severe, did the ALJ properly consider all of Plaintiff's impairments in combination – severe and non-severe – in formulating the RFC? *See* 20 C.F.R. § 404.1545(e); § 416.945(e) ("We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe'[.]"); *see also* SSR 96-8p, 1996 WL 374184, at *5 ("In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not "severe."). Specifically, the ruling recognizes:

> While a "not severe" impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may--when considered with limitations or restrictions due to other impairments--be critical to the outcome of a claim. For example, in combination with limitations imposed by an individual's other impairments, the limitations due to such a "not severe" impairment may prevent an individual from performing past relevant work or may narrow the range of other work that the individual may still be able to do.

15

SSR 96-8p, 1996 WL 374184, at *5. Upon review, the undersigned finds that the ALJ complied

with this mandate.

In a recent published opinion, the Sixth Circuit explained:

Although the ALJ did not specifically discuss the combined effect of Emard's impairments or mention Emard's nonsevere impairments in assessing his residual functional capacity, she stated that she had carefully considered the entire record and "all symptoms" at this step in the process. This court in *Gooch v. Secretary of Health & Human Services*, 833 F.2d 589 (6th Cir. 1987), concluded that an ALJ's statement that he had conducted "a thorough review of the medical evidence of record," along with the fact that the ALJ had considered the claimant's impairments individually, sufficed to show that the ALJ had considered the impairments in combination. *Id*. at 591–92. It explained that "the fact that each element of the record was discussed individually hardly suggests that the totality of the record was not considered," and "[t]o require a more elaborate articulation of the ALJ's thought processes would not be reasonable." *Id*. at 592. As in *Gooch*, the ALJ's statements that she had considered the entire record and all of Emard's symptoms suggest that she had considered Emard's impairments in combination.

Moreover, the ALJ specifically noted in her summary of the applicable law that she was required to comply with SSR 96-8p's mandate to "consider all of the claimant's impairments, including impairments that are not severe." District courts in this circuit have held that an ALJ need not specifically discuss all nonsevere impairments in the residual-functional-capacity assessment when the ALJ makes clear that her decision is controlled by SSR 96-8p. *See, e.g.*, *Morrison v. Comm'r of Soc. Sec.*, No. 1:14-CV-1059, 2016 WL 386152, at *4 (W.D. Mich. Feb. 2, 2016), *aff'd*, No. 16-1360, 2017 WL 4278378 (6th Cir. Jan. 30, 2017); *Davis v. Comm'r of Soc. Sec.*, No. 1:14-CV-0413, 2015 WL 5542986, at *4 (W.D. Mich. Sept. 18, 2015). These decisions have relied on this court's decision in *White v. Commissioner of Social Security*, 572 F.3d 272 (6th Cir. 2009), where an ALJ's statement that she considered a Social Security Ruling pertaining to credibility findings sufficed to show that the ALJ complied with that ruling. *Id.* at 287. The ALJ's express reference to SSR 96-8p, along with her discussion of the functional limitations imposed by Emard's nonsevere impairments at step two of her analysis, fully support our conclusion that the ALJ complied with 20 C.F.R. § 416.945(e) and SSR 96-8p.

*Emard v. Comm'r of Soc. Sec.*, -- F.3d --, 2020 WL 1295047, at *6 (6th Cir. Mar. 19, 2020). The

identified factors from *Emard* are also present in the ALJ's decision in this case. In his summary

of the law, the ALJ explained that at Step Four an ALJ "must consider all of the claimant's

impairments, including impairments that are not severe[.]" (Tr. 11) (citing 20 C.F.R. §§

16

404.1520(e), 404.1545, 416.920(e), 416.945; SSR 96-8p). Moreover, at the end of the Step Two analysis, the ALJ explained that:

> The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments (SSR 96-8p). Therefore the following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

(Tr. 13). Further, at the start of the RFC analysis, the ALJ stated that she "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence[.]" (Tr. 14). Finally, as in *Emard*, the ALJ here expressly "discuss[ed] [ ] the functional limitations imposed by [Plaintiff's] nonsevere impairments at step two of her analysis[.]" 2020 WL 1295047, at *6; *see* Tr. 12-13 (discussing the four areas of mental functioning ("paragraph B criteria")). In this analysis, the ALJ pointed to Plaintiff's abilities to perform daily life activities, and findings on psychological evaluation. *See* Tr. 12-13. Again, at Step Four, in analyzing Plaintiff's subjective symptom reports, the ALJ described Plaintiff's ability "to engage in robust activities of daily living" such as "prepar[ing] simple meals, wash[ing] dishes[,] [ ] shop[ping] in stores", eat[ing] out in restaurants, talk[ing] on the phone with her children and grandchildren", and "visit[ing] with her daughter". (Tr. 15) (citing Tr. 218-19, 221, 699, 1326). He reasonably cited these activities as contrary to Plaintiff's subjective allegations of the effect of depression and memory deficits. *Id.*

Plaintiff argues the ALJ's decision must be reversed because the ALJ made contradictory findings in his analysis of the paragraph B criteria. Specifically, Plaintiff points to the ALJ's analysis regarding Plaintiff's ability to interact with others:

> In this area, Plaintiff has a *mild* limitation. Here, the claimant indicated that she does not engage in any social activities and is tearful during medical visits (Exhibits

3E/6; 21F/15). However, she is able to eat in restaurants, talk on the phone with her children and grandchildren as well as visit with her daughter (Exhibits 3E/6; 7F/7; 23F3). In addition, she is cooperative with medical staff during her follow-up visits (Exhibits 6F/67; 17F/72; 21F/21). Thus, the weight of the evidence supports a finding of *moderate* limitation in this area of functioning.

(Tr. 12) (emphasis added). Plaintiff contends, without citation, that "[a] moderate limitation is indicative of a severe impairment." The Commissioner responds that "this is clearly a clerical error, as the ALJ clearly indicated at the beginning of the paragraph that Plaintiff demonstrated only mild limitation in this area." (Doc. 16, at 9 n.2). In Reply, Plaintiff contends that the Commissioner's "presumption that it is the 'moderate' finding, and not the 'mild' finding that is in error is simply an assertion without basis." (Doc. 17, at 2). The undersigned notes that at the end of the Step Two analysis, the ALJ summarized his paragraph B findings as follows: "Because the claimant's medically determinable mental impairments cause no more than 'mild' limitation in any of the functional areas, they are non-severe (20 CFR 404.1520a(d)(1) and 416.920a(d)(1)." (Tr. 13). This lends support to the Commissioner's clerical error argument. Regardless, however, the interpretation does not change the outcome here. As noted, even if the ALJ erred in failing to find Plaintiff's mental impairments severe, there is no error unless the ALJ also failed to consider them in formulating the RFC. As noted above, the ALJ's decision shows he complied with the requirements to do so. "As in *Gooch*, the ALJ's statements that [he] had considered the entire record and all of [Plaintiff's] symptoms suggest that [he] [ ] considered [Plaintiff's] impairments in combination." *Emard*, 2020 WL 1295047, at *6 (citing *Gooch*, 833 F.2d at 591-92).

Plaintiff is correct that that at Step Four – the RFC analysis – the ALJ only cited Plaintiff's self-report about depression, forgetfulness (Tr. 14) and memory deficits (Tr. 15), and did not specifically cite her counseling records. But an ALJ "can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." *Kornecky v.*

*Comm'r of Soc. Sec.,* 167 F. App'x 496, 508 (6th Cir. 2006). And here (contrary to Plaintiff's argument that the ALJ "all but ignored" her counseling records (Doc. 12, at 13)), the ALJ expressly cited them in his Step Two analysis, illustrating that he considered them. *See* Tr. 12-13 (citing Exhibit 21F – the counseling records – five times). Given these factors, the ALJ's analysis here was sufficient, as it was in *Emard*. *See* 2020 WL 1295047, at *6 ("The ALJ's express reference to SSR 96-8p, along with her discussion of the functional limitations imposed by Emard's nonsevere impairments at step two of her analysis, fully support our conclusion that the ALJ complied with 20 C.F.R. § 416.945(e) and SSR 96-8p.").

Finally, as in *Emard*, and the other cases cited above, Plaintiff's argument that the ALJ erred in finding her mental impairments non-severe must fail. This is so because the ALJ found other impairments severe and proceeded through the remaining steps of the analysis. *See Emard*, 2020 WL 1295047, at *6-7; *Kirkland*, 528 F. App'x at 427; *Anthony*, 266 F. App'x at 457. Because, as set forth above, "the ALJ properly considered [Plaintiff's] nonsevere impairments at later steps, [Plaintiff's] arguments regarding the severity of [her mental impairments] are unavailing." *Emard*, 2020 WL 1295047, at *6.

The undersigned therefore finds Plaintiff has failed to show reversible error in the ALJ's consideration of her mental impairments.

Evaluation of Mr. Carey's Functional Capacity Evaluation

In regard to her physical impairments, Plaintiff contends the ALJ erred in failing to expressly consider the functional capacity evaluation performed by Mr. Carey, and co-signed by Dr. Roesch. The Commissioner responds that any error is harmless. For the reasons discussed below, the undersigned recommends remand.

Generally, the medical opinions of treating physicians are afforded greater deference than

those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188.[1] A treating physician's opinion is given "controlling weight" if it is supported by (1) medically acceptable clinical and laboratory diagnostic techniques; and (2) is not inconsistent with other substantial evidence in the case record. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). The requirement to give controlling weight to a treating source is presumptive; if the ALJ decides not to do so, he must provide evidentiary support for such a finding. *Id.* at 546; *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376-77 (6th Cir. 2013). When the physician's medical opinion is not granted controlling weight, the ALJ must give "good reasons" for the weight given to the opinion. *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)).

"Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* (quoting SSR 96-2p, 1996 WL 374188, at *4). When determining weight and articulating good reasons, the ALJ "must apply certain factors" to the opinion. *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.*

---

1. Although recent revisions to the CFR have changed the rules regarding evaluation of treating physician opinions, such changes apply to claims filed after March 27, 2017, and do not apply to claims filed prior to that date. *See* Social Sec. Admin., *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5852-53, 2017 WL 168819. Plaintiff filed her claim in January 2016 and thus the previous regulations apply.

By contrast, Social Security Ruling 06–3p explains that opinions from "other" medical sources who are not "acceptable medical sources," such as physical therapists, are relevant to the ALJ's determination of a claimant's RFC, but not subject to the same deference:

> Since there is a requirement to consider all relevant evidence in an individual's case record, the case record should reflect the consideration of opinions from medical sources who are not "acceptable medical sources" and from "non-medical sources" who have seen the claimant in their professional capacity. Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

SSR 06-03p, 2006 WL 2329939, at *6.

The parties agree that the ALJ did not mention the functional capacity evaluation or resulting opinion.

The Commissioner first argues that Dr. Roesch's signature on the assessment "does not necessarily transform the opinion from one of an 'other source' to that of an 'acceptable medical source'", citing *Brock v. Colvin*, 2013 WL 4501333, at *6 (M.D. Tenn.). (Doc. 16, at 14, n.5). Under the circumstances presented by the instant case, the undersigned disagrees. First, Dr. Roesch both ordered the functional capacity evaluation (*see* Tr. 1390 – "referral source" listed as Dr. Roesch), and co-signed it (*see* Tr. 1394). *See Brown v. Comm'r of Soc. Sec.*, 2015 WL 4275556, at *11-12 (N.D. Ohio) ("Although the issue has yet to be addressed by the Sixth Circuit, prior decisions have held that a doctor's co-signature indicates at a minimum that the doctor agrees with the other sources opinion . . . [i]t follows then, that if the signing physician or psychologist has personally examined the claimant, the opinion must be treated as the doctor's own.").

Second, in an independent physical impairment questionnaire completed a month later, Dr. Roesch did not complete the specific functional limitations questions, but wrote what appears to

say: "please see attached evaluation". (Tr. 1321). It is not readily apparent whether Dr. Roesch attached the functional capacity evaluation, but between this comment, and her co-signature on the evaluation itself, the undersigned finds that evaluation qualifies as a treating physician opinion entitled to higher deference under the regulations. *See, e.g., Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 435 (6th Cir. 2014) ("Although Smith-Johnson takes issue with the consideration of Koopman's report because she is not an 'acceptable medical source,' she makes no attempt to explain why a report that is co-signed by an acceptable medical source (a licensed psychologist) cannot be considered."); *see also Ball v. Comm'r of Soc. Sec.*, 2019 WL 3071852, at *4 (S.D. Ohio) (collecting authorities for the proposition that, under the law, there is no difference between opinions filled out and signed by a treating physician and opinions filled out by another source and then signed – thus adopted – by the treating physician), *report and recommendation adopted*, 2019 WL 3431182 ; *Strickland v. Saul*, 2019 WL 4141534, at *5 (N.D. Ohio) ("District Courts within this Circuit have treated opinions co-signed by a physician as opinions of that physician.") (collecting cases).

The Commissioner next argues that even if the opinion is entitled to deference, any failure to consider it is harmless because the ALJ indirectly attacked the opinion and thus satisfied the goal of the regulations. In *Wilson v. Commissioner of Social Security*, the Sixth Circuit explained that some violations of the treating physician rule "may qualify as harmless error" and "may not warrant reversal". 378 F.3d 541, 547 (6th Cir. 2004). The *Wilson* court gave three examples: (1) "if a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it"; (2) "if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion"; and (3) "where the Commissioner has met the goal of [the treating physician rule]—the provision of the procedural safeguard of reasons—even though she has not

complied with the terms of the regulation." *Id*. The Commissioner contends the third of these exceptions applies here because the ALJ "indirectly attacked [the functional capacity evaluation opinion] with his detailed evaluation of Plaintiff's physical impairments." (Doc. 16, at 14) (citing *Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 472 (6th Cir. 2006)). But the *Nelson* exception is a narrow one. And as the Sixth Circuit has held "the harmless-error inquiry require[s] more than a showing that the claimant simply had little chance of winning on the merits." *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 747 (6th Cir. 2007). *Bowen* regarded the complete failure even to mention a treating source's opinion as a significant "transgression" of § 404.1527(d), and held that the absence of "even a passing reference to [the treating source's] opinion in the ALJ's decision" does not allow the court "to infer that the ALJ intended to indirectly attack it," thereby satisfying the regulatory goal that rejections of opinions of treating sources be explained in some fashion for the benefit of both the claimant and the reviewing court. *Id.* at 749. Indeed, as Plaintiff points out (Doc. 17, at 5), in *Nelson* itself, the ALJ specifically referenced the medical opinion at issue. *See Nelson*, 195 F. App'x at 470 ("The ALJ's references to the opinions of Drs. Cook and Peterson are brief, and provide no explicit indication of the weight it gave either doctor's opinion regarding Nelson's limitations, as the ALJ was required to do."). By contrast here, the ALJ did not mention the functional capacity evaluation co-signed by Dr. Roesch at all. As such, the undersigned cannot find the ALJ's failure to consider the evaluation was harmless and remand is required. *See Blakley v. Comm'r of Soc. Sec.,* 581 F.3d 399, 407 (6th Cir. 2009) (holding that an ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record").[2]

---

2. Moreover, the functional capacity evaluation differs significantly – particularly with its detailed evaluation and subsequent findings – from Dr. Roesch's other opinions addressed by the ALJ's decision. Therefore, the undersigned rejects the Commissioner's argument that the ALJ's

Plaintiff also argues that the reasons the ALJ provided for discounting Dr. Roesch's other opinions are "flawed". (Doc. 12, at 18, 19). This is so, she contends, because the reasons provided do not adequately account for the nature of fibromyalgia.

Fibromyalgia "is a medical condition marked by 'chronic diffuse widespread aching and stiffness of muscles and soft tissues.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 244 n.3 (6th Cir. 2007) (quoting STEDMAN'S MEDICAL DICTIONARY FOR HEALTH PROFESSIONALS AND NURSING, 542 (5th ed. 2005)); *see also* SSR 12–2p, 2012 WL 3104869, at *2 (fibromyalgia is a "complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues that has persisted for at least 3 months"). "[P]hysical examinations will usually yield normal results—a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions. There are no objective tests which can conclusively confirm the disease; rather it is a process of diagnosis by exclusion." *Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 818 (6th Cir. 1988)). "Opinions that focus solely upon objective evidence are not particularly relevant" due to "the unique evidentiary difficulties associated with the diagnosis and treatment of fibromyalgia." *Rogers*, 486 F.3d at 245. "Nonetheless, a *diagnosis* of fibromyalgia does not automatically entitle [a claimant] to disability benefits." *Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 806 (6th Cir. 2008) (emphasis in original). "Some people may have a severe case of fibromyalgia as to be totally disabled from working but most do not, and the question is whether claimant is one of the minority." *Id.* at 806; *see also Stankoski v. Astrue*, 532 F. App'x 614, 619 (6th Cir. 2013) ("But a diagnosis of fibromyalgia does not equate to a finding of disability or an entitlement to benefits.").

---

evaluation of Dr. Roesch's other opinions "with similar restrictions" was sufficient. *See* Doc. 16, at 14-15).

The ALJ addressed Dr. Roesch's March 2017 medical excuse note (Tr. 799) and September 2017 physical impairment questionnaire (Tr. 1321-22):

> The claimant's primary physician, Erica Roesch, M.D., submitted multiple opinions. F[irst], on a medical excuse dated March 30, 2017, Dr. Roesch opined that the claimant is unable to sit or stand, lift, push, pull or walk for eight-hour periods of time (Exhibit 18F/41). Second, on a physical impairment form dated September 14, 2017, Erica Roesch, M.D., the claimant's primary physician, opined that the claimant is unable to work an eight-hour day, five days a week employment on a sustained basis (Exhibit 22F/3).
>
> Here, the undersigned assigns little weight to the opinions of Dr. Roesch. As already discussed, the record shows occasional periods of joint, lumbar and cervical tenderness as well as decreased range of spinal motion. Nonetheless, the record shows that the claimant's condition improved with conservative treatment. Further, right knee and right foot imaging were normal and unremarkable. In addition, lumbar, cervical and thoracic imaging showed mild findings. In addition to the opinion, Dr. Roesch indicated in the September 2017 opinion that the claimant's fibromyalgia was stable with treatment. Moreover, a finding of disability is an issue reserved to the Commissioner (20 CFR 404.1527(d)(1), (2); 416.927(d)(1), (2)).

(Tr. 16).

Because remand is required to consider the functional capacity evaluation co-signed by Dr. Roesch and because this may change the ALJ's evaluation of Dr. Roesch's other opinions, the undersigned declines to reach Plaintiff's argument regarding these opinions. The ALJ should consider (as set forth above) the nature of fibromyalgia in addressing the opinion evidence on remand.

## CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying SSI and DIB lacks the support of substantial evidence as detailed above and recommends the decision be reversed and remanded pursuant to Sentence Four of 42 U.S.C. § 405(g).

 s/James R. Knepp II
United States Magistrate Judge

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).